[Cite as *Liberty Aviation Museum, Inc. v. JRM Marine Consulting*, 2023-Ohio-2982.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
OTTAWA COUNTY

Liberty Aviation Museum, Inc.                    Court of Appeals No.  OT-22-053

       Appellant                    Trial Court No.  180CV0169

v.

JRM Marine Consulting, LLC, d/b/a
Treasure Cove Marina, et al.                    **<u>DECISION AND JUDGMENT</u>**

       Appellees                    Decided:  August 25, 2023

* * * * *

Kenneth D. Myers, for appellant.

Eric J. Weiss, for appellee JRM Marine Consulting, LLC,
d/b/a Treasure Cove Marina.

Cory J. Martinson, for appellee The Storage Building, LLC.

* * * * *

**SULEK, J.**

**{¶ 1}** Appellant Liberty Aviation Museum, Inc. ("Liberty Aviation"), appeals the

judgment of the Ottawa County Court of Common Pleas awarding R.C. 2323.51

sanctions to appellees John R. Moore III, Joan Moore, Kara B. Johnson (nka Gogokek), Treasure Cove Marina, Inc., Kara B. Johnson, Ltd., Cove West Properties, The Yacht Centre, Ltd., Johnson's Best Buy Marine, LLC, and 904 Treasure Cove Marine, LLC (collectively "the Moore defendants"), and appellee The Storage Building, LLC ("Storage Building").  Because the trial court did not err in awarding sanctions for attorney fees that were incurred after it became clear that Liberty Aviation's conduct was frivolous, the judgment of the Ottawa County Court of Common Pleas is affirmed.

## I. Background

{¶ 2} The genesis of the present matter began in September 2012 when Liberty Aviation contracted with JRM Marine Consulting LLC d/b/a/ Treasure Cove Marina ("JRM Marine") to repair and restore a World War II era PT Boat owned by Liberty Aviation.  The repairs did not go as planned, resulting in claims and counterclaims being filed in 2014.  Ultimately, following a bench trial, the trial court awarded approximately $45,000 in damages to Liberty Aviation for labor, parts, and materials overcharges.  This court affirmed the trial court's December 22, 2015 judgment in *JMR* (sic) *Marine Consulting LLC v. Liberty Aviation Museum, Inc.*, 6th Dist. Ottawa No. OT-16-024, 2017-Ohio-5686.

{¶ 3} Thereafter, Liberty Aviation determined that additional damage was done to the boat.  On April 23, 2018, Liberty Aviation filed a complaint against JRM Marine alleging that JRM Marine breached a contract or was otherwise liable for damages caused

2.

by its failure to properly repair and restore the boat. JRM Marine moved for judgment on the pleadings, which the trial court denied in February 2019. Thereafter, JRM Marine stopped participating in the case. Around October 2019, the sole owner of JRM Marine, John Robert Moore IV ("Rob"), suffered a debilitating stroke. Counsel could not communicate with Rob and could not comply with Liberty Aviation's discovery requests. On June 9, 2020, counsel moved to withdraw from representing JRM Marine, which the trial court granted.

{¶ 4} On June 15, 2020, Liberty Aviation moved for summary judgment on its claims, which went unopposed. The trial court granted summary judgment to Liberty Aviation as to liability on July 28, 2020. A hearing on damages was then held on August 11, 2020, at which JRM Marine did not appear. Following the hearing, the trial court entered judgment in Liberty Aviation's favor in the amount of $3,831,643.02 plus attorney fees to be determined at a later time. Rob died on September 18, 2020, from complications from the stroke.

{¶ 5} On February 17, 2021, Liberty Aviation filed a motion to "pierce the corporate veil/join new parties/amend complaint." Liberty Aviation alleged that around the same time that it filed its 2018 lawsuit, Rob and his relatives "engaged in a long process of dissipating [JRM Marine's] resources for their own use," using "numerous shell corporations to hide ownership, transfer assets and evade financial responsibility." Attached to the motion were voluminous pages of financial documents, bank records, and

3.

canceled checks. On February 23, 2021, the trial court granted Liberty Aviation's motion to amend its complaint.

{¶ 6} On March 23, 2021, Liberty Aviation filed its amended complaint naming JRM Marine and an additional 27 persons and entities as defendants. The amended complaint asserted one count of "fraud or other illegal or unlawful acts" on behalf of all the defendants by "contribut[ing] to misusing the corporate form as a shield from liability for their own misdeeds." The complaint asserted a second count for civil conspiracy based on the defendants' "acts and omissions described above, including but not limited to the acts and omissions involved in commingling, concealing, transferring and/or hiding assets that are subject to the judgment against defendant JRM Marine."

{¶ 7} Between May and June 2021, Liberty Aviation voluntarily dismissed eight of the defendants.

{¶ 8} The parties then engaged in discovery and a number of depositions were taken. On October 19, 2021, Liberty Aviation deposed Rob's father, John Robert Moore III ("John"). John described the various business relationships in this case. Of note, John was a part-owner of Treasure Cove Marina, Inc., which operated for many years in the boating business. In the mid-1990s, Treasure Cove Marina, Inc. was sold to an unrelated company MarineMax. Eventually, in 2009, Rob started JRM Marine. JRM Marine used the trade name Treasure Cover Marina.

4.

{¶ 9} John and his wife Joan owned Kara B. Johnson, Ltd. ("KBJ"), and KBJ owned the property located at 900-904 SE Catawba Rd. in Port Clinton, Ohio.[1] In September 2016, JRM Marine entered into a ten-year lease agreement with KBJ to lease the property for a monthly rent of $5,400.

{¶ 10} At the same time, KBJ leased a portion of 904 SE Catawba Rd. to Storage Building for $1 per month, with the understanding that Storage Building would construct and sublet a storage building. Storage Building was owned by John and his son-in-law, Donald L. Williams, Jr. In November 2016, JRM Marine entered into a seven-year lease with Storage Building for use of the storage building that was constructed at 904 SE Catawba Rd. The lease agreement provided that JRM Marine would pay a monthly rent of $3,900. In addition to that lease, in September 2016, JRM Marine executed a loan agreement with Storage Building, whereby JRM Marine borrowed $50,000 at a 5% interest rate, to be repaid in monthly installments of $943.56 over a five-year term.

{¶ 11} In 2018, John and Donald Williams formed Storage Building II to construct a second storage building at 904 SE Catawba Rd.[2] JRM Marine entered into an agreement in October 2018 with Storage Building II to solicit and service customers who wished to store their boats in the storage building.

---

[1] John and Joan's daughter, Kara B. Johnson, at one time was also a co-owner of KBJ. However, prior to the events giving rise to this appeal, Kara Johnson transferred her ownership to her parents ostensibly in exchange for the forgiveness of outstanding loans.

[2] Storage Building II was not named as a defendant in the amended complaint.

5.

**{¶ 12}** John testified that Rob has not been very successful in his business ventures and provided handwritten ledgers of loans that he made to Rob and to Rob's various business entities over the years. The ledgers showed that the final disbursement was made in 2007, although John testified that it is possible that he loaned additional money to Rob after that time. The amount of unpaid loans totaled in the millions of dollars.

**{¶ 13}** John also testified that while he frequently spoke with Rob about business, John was not in any way involved or responsible for the operation of JRM Marine. Before Rob's stroke, John was never an owner, operator, or employee of JRM Marine; however, for two months after Rob's stroke, John stepped in and ran the daily operations of the business. John explained that he was at least partially motivated to keep the business running in order to protect his rent check that JRM Marine was paying to KBJ. To facilitate his efforts, John formed 904 Treasure Cove Marine, LLC, but that company was rarely used.

**{¶ 14}** John testified that when he took over JRM Marine in October 2019, the company was not in a good financial position. John testified that he spent $100,000 of his own money to pay the bills, make payroll, and complete transactions for customers. Approximately two months later, one of JRM Marine's employees, Kevin Frantz, approached John about taking over and running the company. Frantz then formed Above Board Boats & Brokerage, LLC ("Above Board"), and assumed operations. John

6.

testified that no assets were transferred and Above Board did not pay any money for the business. Above Board simply entered into a lease agreement with KBJ and continued servicing JRM Marine's existing customer base. John testified that when JRM Marine ceased operating it did not have any assets.

{¶ 15} Eventually, in March 2021, John sold KBJ, the property, Storage Building, and Storage Building II to an unrelated company named C-Land.

{¶ 16} Edward Patrick, Jr., the CEO of Liberty Aviation, was deposed on October 20, 2021. Patrick testified that Liberty Aviation's efforts to pierce the corporate veil and hold the newly named defendants liable were based on the various associations and transactions between the businesses. However, Patrick did not have personal knowledge of any facts that would show that any of the defendants fraudulently or illegally used the corporate form to shield themselves from liability for their own wrongdoing. Nor did Patrick have any personal knowledge that any of the defendants had any ownership of JRM Marine, commingled assets with JRM Marine, or hid or concealed assets on behalf of JRM Marine. Instead, Patrick relied upon the documents attached to Liberty Aviation's motion to pierce the corporate veil.

{¶ 17} On November 30, 2021, Kevin Frantz was deposed. Frantz testified similarly to John. Frantz began working as the general manager of JRM Marine in the spring of 2019. Frantz testified that prior to Rob having his stroke, JRM Marine was "a complete disaster" financially. JRM Marine's accounts were always overdrawn, bill

7.

collectors were calling, and it had a hard time making payroll. Frantz testified that all of the financial decisions were made by Rob and that only Rob could authorize any transactions out of the bank account. During this time, John was present but had no authority over any of the business operations. Frantz considered John to be more of a nuisance and testified that Rob was always finding little projects for him to do.

{¶ 18} After Rob had the stroke, Frantz continued to run JRM Marine, with John taking Rob's place. Frantz testified that John contributed his own money, whether personally or through KBJ, to meet the financial obligations of JRM Marine, including paying the utilities and payroll. Between one and two months later, John approached Frantz seeking to get rid of the business. Frantz did not have any money to buy the business, but the two agreed that Frantz would take up the operations of JRM Marine and service its existing clients. Frantz formed Above Board and entered into a lease agreement with KBJ and storage agreements with Storage Building and Storage Building II.

{¶ 19} At the time that Above Board took over servicing JRM's existing customers, the business consisted of acting as a broker for customers wishing to sell their boats. JRM Marine did not itself own any boats. In addition, Above Board would service customers who wished to store their boats over the winter. The storage fee was paid to Storage Building and Storage Building II, with Above Board keeping a percentage as commission. Above Board then hoped to provide boat maintenance and

8.

repair services to the customers to prepare the boats for the next season. Frantz testified that Above Board did not acquire any assets from JRM Marine. While Above Board was in business, John would still hang around the property and try to insert himself into sales or repairs, but Frantz told him to leave because he did not want him there. John was never an employee, operator, or owner of Above Board.

{¶ 20} After a little more than a year in business, Frantz decided that he no longer wanted to run Above Board and ultimately agreed to accept $30,000 from John to terminate his lease so that John could sell the property to C-Land in March 2021.

{¶ 21} On January 25, 2022, Liberty Aviation moved for leave to file a second amended complaint, adding Don Williams and Storage Building II as defendants. The Moore defendants and Storage Building opposed the motion and it was ultimately denied by the trial court.

{¶ 22} On February 9, 2022, Lara Frantz ("Lara"), Rob's ex-wife, was deposed.[3] Despite sharing a last name, Lara is not related to Kevin Frantz. The general import of Lara's testimony was that Rob was not particularly organized or financially responsible.

{¶ 23} Lara testified that she had no knowledge of Rob's business dealings and that she and Rob kept their personal finances separate from each other. Lara testified that she was not aware of any significant assets that Rob had in the time just before his stroke other than a Rolex watch. After his stroke, Rob signed a form granting power of attorney

---

[3] Lara and Rob dissolved their marriage shortly before Rob's death in an attempt to qualify for Medicaid so that Rob could receive better support services.

9.

to John so that John could run the business. Lara testified that she also gave John boxes and briefcases full of documents that related to the business, although Lara was not aware of what the documents actually were. Lara suggested that while John was often around the business, he and Rob had a difficult relationship.

{¶ 24} Following discovery, on April 20, 2022, the Moore defendants and Storage Building separately moved for summary judgment.

{¶ 25} In their motions, the Moore defendants and Storage Building argued that Liberty Aviation was not entitled to recover against them under the theory of piercing the corporate veil because they were never members, owners, directors, officers, or held any interest in, or control over, JRM Marine. Likewise, JRM Marine was never a member, owner, director, officer, or held any interest in, or control over, either the Moore defendants or Storage Building.

{¶ 26} Next, the Moore defendants and Storage Building argued that they were entitled to summary judgment on the fraud claim because any payments from JRM Marine were for rent or loan payments pursuant to arms-length negotiated written agreements and Liberty Aviation failed to produce any evidence demonstrating otherwise.

{¶ 27} Finally, the Moore defendants and Storage Building argued that they were entitled to summary judgment on the civil conspiracy claim because Liberty Aviation has

10.

produced no evidence that any of the Moore defendants or Storage Building committed any illegal or unlawful act.

{¶ 28} In a consolidated response, Liberty Aviation opposed both motions on May 4, 2022. Liberty Aviation argued that the corporate veil should be pierced and the Moore defendants and Storage Building should be held liable because John was intertwined with JRM Marine and the other entities were intertwined with John. As evidence of John's involvement with JRM Marine, Liberty Aviation pointed to the two months that John ran the business following Rob's stroke. Liberty Aviation also identified a number of payments that were made from JRM Marine to KBJ, Storage Building, and Joan Moore, as well as payments from JRM Marine to Rob's ex-wife and for child support. Liberty Aviation's apparent theory was that because John was the alleged alter ego of JRM Marine during October and November 2019, he and all of the businesses associated with him should be held liable for JRM Marine's years-earlier-conduct in repairing the PT boat. Relatedly, Liberty Aviation argued that John and all the businesses associated with him should be liable for the $3.8 million judgment because John allowed JRM Marine's business to be assumed by Above Board without any compensation for the established goodwill of the companies operating under the name Treasure Cove Marina.

11.

{¶ 29} The Moore defendants and Storage Building replied in support of their motions for summary judgment, in part noting that the bank records and other materials relied upon by Liberty Aviation were not properly authenticated under Civ.R. 56(E).

{¶ 30} On June 7, 2022, the trial court granted summary judgment in favor of the Moore defendants and Storage Building. At the outset, the trial court recognized that Liberty Aviation's response to the motion for summary judgment did not contain any affidavits or other evidence contemplated by Civ.R. 56(C).

{¶ 31} Turning to the merits of Liberty Aviation's claim of fraud, the trial court first found that Liberty Aviation presented no evidence that any particular transaction was made with the intent to hinder, delay, or defraud Liberty Aviation in the collection of its judgment. Nor did Liberty Aviation identify any particular transaction for which JRM Marine did not receive reasonably equivalent value in exchange. Thus, the trial court held that there was no evidence of fraudulent transactions between JRM Marine and the defendants.

{¶ 32} Next, as to the claim of civil conspiracy, the trial court determined that Liberty Aviation did not present any evidence of a malicious animus by any of the defendants or any evidence of an underlying unlawful act.

{¶ 33} Finally, the trial court considered the doctrine of piercing the corporate veil and examined whether each defendant could be liable for the $3.8 million judgment against JRM Marine. To pierce the corporate veil, it must be shown that "(1) control over

12.

the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong." *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.*, 67 Ohio St.3d 274, 617 N.E.2d 1075 (1993), paragraph three of the syllabus. As to the Moore defendants, the trial court found that there was no evidence that Joan Moore, Kara B. Johnson, Treasure Cove Marina, Inc., Kara B. Johnson, Ltd., Cove West Properties, The Yacht Centre, Ltd., or Johnson's Best Buy Marine, LLC, controlled JRM Marine so completely that JRM Marine had no separate mind, will, or existence of its own. Likewise, the trial court found that there was no evidence that Storage Building controlled JRM Marine.

{¶ 34} The court did, however, find that John and 904 Treasure Cove Marine, LLC, did completely control, and thus were "alter egos" of JRM Marine during the months of October and November 2019. Nonetheless, the trial court found that there was no evidence that either one committed fraud or an illegal act during that period. The court noted that had Liberty Aviation's evidence been properly before the court, it would have shown that just prior to Rob's stroke, JRM Marine's bank account contained only $1,892.17. Further, the evidence from the deposition testimony showed that John used $100,000 of his own funds to keep JRM Marine in business during that time.

13.

**{¶ 35}** Therefore, the court held that the corporate veil could not be pierced to hold any of the defendants liable, awarded summary judgment to them, and dismissed Liberty Aviation's complaint against them.

**{¶ 36}** A few weeks later, the trial court likewise granted summary judgment in favor of Kevin Frantz and Above Board. A few weeks after that, Liberty Aviation dismissed its complaint against the remaining defendants.

## II. Defendants Move for Sanctions

**{¶ 37}** Giving rise to the present appeal, on July 19, 2022, the Moore defendants and Storage Building filed similar motions seeking sanctions pursuant to R.C. 2323.51 for Liberty Aviation's frivolous conduct in prosecuting the case. The defendants argued that Liberty Aviation's conduct was frivolous in that its claims were based on allegations that had no evidentiary support, its claims were not warranted under existing law and could not be supported by a good faith argument for an extension of the law, and its claims served merely to harass the defendants and needlessly increase the costs of litigation.

**{¶ 38}** Liberty Aviation opposed the motions for sanctions in a consolidated opposition, arguing that while ultimately it was not successful in the underlying case, its conduct could not be considered as outrageous to the point of warranting sanctions. Liberty Aviation asserted that given all of the evidence suggesting John's involvement in all of the interlocking family businesses and funds, it was reasonable to pursue the claims

14.

through summary judgment. Further, Liberty Aviation argued that it should not be responsible for the attorney fees of the defendants where the defendants did not move to dismiss the complaint or communicate to Liberty Aviation that its claims were frivolous, but instead continued to participate in the litigation.

{¶ 39} The trial court held a hearing on the motions for sanctions on September 21, 2022. At the hearing, the Moore defendants and Storage Building presented evidence of the amount of attorney fees that they spent during the litigation. For its part, Liberty Aviation called the attorneys for the Moore defendants and Storage Building as witnesses. Liberty Aviation asked the attorneys why they litigated the case to summary judgment instead of attempting to have their clients dismissed sooner if they believed that Liberty Aviation's lawsuit was frivolous. The implication of Liberty Aviation's question was that the Moore defendants and Storage Building could have limited the amount of attorney fees that they incurred. The attorneys responded that based on the way the complaint was drafted, a motion to dismiss likely would have been unsuccessful and summary judgment was the first procedural mechanism available to have the case dismissed. Further, the attorneys argued that it was not their responsibility to mitigate the damages caused by Liberty Aviation's frivolous conduct.

{¶ 40} Following the hearing, the trial court entered judgment in favor of the Moore defendants and Storage Building on September 29, 2022. The trial court determined that Liberty Aviation's conduct was frivolous in that its claims were based on

15.

allegations that had no evidentiary support, were not warranted based on existing law, and could not be supported by a good faith argument for an extension of the law. Specifically, the trial court found that as of the date of Kevin Frantz's deposition testimony, November 30, 2021, a reasonable attorney would have understood that the claims presented by Liberty Aviation had no merit. The trial court, therefore, granted the Moore defendants' and Storage Building's motions for sanctions and awarded them $24,800.12 and $35,394.50, respectively, for the attorney fees incurred beginning on December 1, 2021.

### III. Assignment of Error

{¶ 41} Liberty Aviation has timely appealed the trial court's September 29, 2022 judgment entry and asserts one assignment of error:

> 1. The trial court erred in granting defendants' motions for sanctions.

### IV. Analysis

{¶ 42} In its assignment of error, Liberty Aviation argues that the trial court abused its discretion because Liberty Aviation's conduct was not the type of egregious conduct that warrants sanctions. In this case, the Moore defendants and Storage Building sought, and the trial court awarded, attorney fees pursuant to R.C. 2323.51. R.C. 2323.51(B)(1) provides, in relevant part, "[A]ny party adversely affected by frivolous conduct may file a motion for an award of court costs, reasonable attorney's fees, and other reasonable expenses incurred in connection with the civil action or appeal."

16.

**{¶ 43}** Liberty Aviation does not contest that its actions met the definition of "conduct" contained in R.C. 2323.51(A)(1)(a) ("'Conduct' means any of the following: (a) The filing of a civil action, the assertion of a claim, defense, or other position in connection with a civil action, the filing of a pleading, motion, or other paper in a civil action, including but not limited to, a motion or paper filed for discovery purposes, or the taking of any other action in connection with a civil action."). Instead, the issue presented in this appeal is whether Liberty Aviation's conduct was "frivolous."

### A. Liberty Aviation's Conduct was Frivolous

**{¶ 44}** Applicable here, "frivolous conduct" means

Conduct of an inmate or other party to a civil action * * * or of the inmate's or other party's counsel of record that satisfies any of the following:

(i) It obviously serves merely to harass or maliciously injure another party to the civil action or appeal or is for another improper purpose, including, but not limited to, causing unnecessary delay or a needless increase in the cost of litigation.

(ii) It is not warranted under existing law, cannot be supported by a good faith argument for an extension, modification, or reversal of existing law, or cannot be supported by a good faith argument for the establishment of new law.

17.

(iii) The conduct consists of allegations or other factual contentions that have no evidentiary support or, if specifically so identified, are not likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

(iv) The conduct consists of denials or factual contentions that are not warranted by the evidence or, if specifically so identified, are not reasonably based on a lack of information or belief.

R.C. 2323.51(A)(2)(a)(i)-(iv).

{¶ 45} In its judgment entry, the trial court found that Liberty Aviation's "claims of piercing the corporate veil against the Moore Defendants and [Storage Building] were not warranted under existing law," thereby implicating R.C. 2323.51(A)(2)(a)(ii).[4] Because whether Liberty Aviation's conduct was warranted under existing law requires a legal determination, the trial court's finding of frivolous conduct is reviewed de novo. *Krohn v. Krohn*, 2017-Ohio-408, 84 N.E.3d 249, ¶ 28 (6th Dist.), citing *Grove v. Gamma Ctr.*, 3d Dist. Marion No. 9-14-29, 2015-Ohio-1180, ¶ 67. "In determining whether the claim itself is frivolous, the test is whether no reasonable lawyer would have brought the

---

[4] Notably, at the hearing on the motions for sanctions, the trial court commented that Liberty Aviation's conduct was both not warranted under existing law and consisted of factual contentions that did not have evidentiary support after a reasonable opportunity for discovery, thereby implicating both R.C. 2323.51(A)(2)(a)(ii) and (iii). In addition, the trial court's September 29, 2022 judgment entry cites both R.C. 2323.51(A)(2)(a)(ii) and (iii) in its opening section. Notwithstanding the trial court's apparent, but not explicit, reliance on both sections, this appeal will focus solely on the trial court's determination under R.C. 2323.51(A)(2)(a)(ii).

18.

action in light of the existing law." *Stafford v. Columbus Bonding Ctr.*, 177 Ohio App.3d 799, 2008-Ohio-3948, 896 N.E.2d 191, ¶ 6 (10th Dist.), citing *Orbit Electronics, Inc. v. Helm Instrument Co., Inc.*, 167 Ohio App.3d 301, 2006-Ohio-2317, 855 N.E.2d 91, ¶ 49 (8th Dist.); *Stone v. House of Day Funeral Service, Inc.*, 140 Ohio App.3d 713, 721, 748 N.E.2d 1200 (6th Dist.2000) ("R.C. 2323.51 employs an objective standard in determining whether sanctions may be imposed against either counsel or a party for frivolous conduct.").

{¶ 46} In Liberty Aviation's appellate brief, it argues that a reasonable attorney would have similarly pursued the matter in an attempt to collect on the $3.8 million judgment against JRM Marine. As was common throughout the proceedings in the trial court, Liberty Aviation does not precisely identify under what theory the Moore defendants or Storage Building should be liable for the $3.8 million judgment. Instead, Liberty Aviation's argument consists of a combination of assertions that the Moore family had interlocking companies, there was commingling of funds, JRM Marine had millions of dollars flow through its accounts, the Moore family used JRM Marine as a piggybank, John controlled JRM Marine in October and November 2019, John received a power of attorney from Rob following Rob's stroke, and John allowed Kevin Frantz to take over the business without paying any compensation.

19.

## 1. Piercing the Corporate Veil

{¶ 47} To the extent that Liberty Aviation pursued recovery under the theory of piercing the corporate veil—which was the predominant theory discussed in the proceedings below—the facts support the trial court's conclusion that Liberty Aviation's conduct was frivolous.  To pierce the corporate veil, a plaintiff must show that "(1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong." *Belvedere Condominium Unit Owners' Assn.*, 67 Ohio St.3d at 289, 617 N.E.2d 1075; *Pierre Invests., Inc. v. CLS Capital Group, Inc.*, 2022-Ohio-4311, 202 N.E.3d 870, ¶ 28 (6th Dist.).

{¶ 48} Regarding the first prong, it was patently obvious early in the litigation, but certainly no later than November 30, 2021, following the depositions of John, Patrick, and Kevin Frantz, that Rob was the sole owner and member of JRM Marine and exercised total control over the company until his stroke.

{¶ 49} As to the corporate defendants, it is well-settled in Ohio that "a plaintiff cannot pierce the corporate veil of one corporation to reach its sister corporation." *Minno*

*v. Pro-Fab, Inc.*, 121 Ohio St.3d 464, 2009-Ohio-1247, 905 N.E.2d 613, ¶ 13.  In *Minno*, the Ohio Supreme Court explained,

> A corporation's veil may not be pierced in order to hold a second corporation liable for the corporate misdeeds of the first when the two corporations have common individual shareholders but neither corporation has any ownership interest in the other corporation.  Despite the element of common shareholder identity, sister corporations are separate corporations and are unable to exercise control over each other in the manner that a controlling shareholder can.  This lack of ability of one corporation to control the conduct of its sister corporation precludes application of the piercing-the-corporate-veil doctrine.

*Id.* at ¶ 13.  Thus, Liberty Aviation's attempt to pierce JRM Marine's corporate veil to reach the assets of Treasure Cove Marina, Inc., Kara B. Johnson, Ltd., Cove West Properties, The Yacht Centre, Ltd., Johnson's Best Buy Marine, LLC, 904 Treasure Cove Marine, LLC, and Storage Building was futile and not warranted under existing law.

{¶ 50} Furthermore, concerning the remaining individual defendants, only John could conceivably be argued to have exerted any control over JRM Marine; the undisputed evidence was that Joan Moore and Kara Johnson had no involvement in operating Rob's business whatsoever.  Thus, Liberty Aviation's attempt to pierce the

21.

corporate veil and reach the assets of Joan Moore and Kara Johnson was futile and not warranted under existing law.

{¶ 51} As to John, the testimony provided by both John and Kevin Frantz revealed that prior to Rob's stroke, John was present at the business, but had no control or authority over the business. According to Frantz, Rob had sole authority and exclusive control over JRM Marine and its finances. However, as recognized by the trial court, John did take over the business and arguably became the alter ego of JRM Marine for two months following Rob's stroke in October and November 2019. Thus, for those two months, John's control of JRM Marine met the first prong of the *Belvedere* test.

{¶ 52} Moving to the second prong, Liberty Aviation was required to demonstrate that John's control of JRM Marine was exercised in such a manner as to commit fraud or an illegal act against Liberty Aviation. Following discovery and the depositions, there was no evidence that John exercised control over JRM Marine during October and November 2019 in that way. Kevin Frantz's testimony established that JRM Marine's finances were a "disaster" for the six months prior to Rob's stroke. Indeed, the bank account statement attached to Liberty Aviation's opposition to the motions for summary judgment revealed that JRM Marine had less than $2,000 in its bank account in October 2019. Liberty Aviation could produce no evidence that John depleted the assets of JRM Marine in any way during October and November 2019. To the contrary, the testimony indicates that John funded JRM Marine with approximately $100,000 of his own money

22.

to meet the obligations of the business, such as paying utility bills, payroll, and money owed to customers for boat transactions. Liberty Aviation makes much of the fact that John allowed Frantz to take over the business without compensation, but the undisputed testimony was that Frantz simply continued serving the existing customers and did not acquire any assets. Further, although Liberty Aviation suggested that JRM Marine operating as Treasure Cove Marina had some goodwill value, it did not present any evidence in any way establishing that value. Further still, even if it could be established that JRM Marine had some unrealized value in November 2019, Liberty Aviation produced no evidence that John's decision to close the business and allow Frantz to take over was done to commit fraud or other illegal act against Liberty Aviation. Thus, Liberty Aviation's attempt to pierce JRM Marine's corporate veil to reach the assets of John was futile and not warranted under existing law.

## 2. Fraud

{¶ 53} To the extent that Liberty Aviation pursued recovery under a theory of fraud, its claims were likewise frivolous. Liberty Aviation did not plead its fraud claim with particularity as required by Civ.R. 9(B), so it is unclear if Liberty Aviation sought to recover under common-law fraud or under R.C. 1336.04, which prohibits fraudulent transactions.

23.

{¶ 54} Common-law fraud requires that a plaintiff prove:

(a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.

*Russ v. TRW, Inc.*, 59 Ohio St.3d 42, 49, 570 N.E.2d 1076 (1991); *Pierre Investments, Inc.*, 2022-Ohio-4311, 202 N.E.3d 870, at ¶ 13.

{¶ 55} Here, Liberty Aviation has neither alleged, nor produced evidence to show, that Storage Building or any of the Moore defendants had any relationship or communication with Liberty Aviation prior to the filing of the amended complaint. Thus, Liberty Aviation's claim fails the first element requiring either a representation or concealment of a fact where there is a duty to disclose. Thus, a common-law fraud claim was futile and not warranted under existing law.

{¶ 56} Likewise, a claim for fraudulent transactions under R.C. 1336.04 was not warranted. R.C. 1336.04(A) provides,

A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the claim of the creditor arose before, or within a

reasonable time not to exceed four years after, the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following ways:

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor;

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and if either of the following applies:

(a) The debtor was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;

(b) The debtor intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

{¶ 57} Here, Liberty Aviation identified several categories of transactions from JRM Marine. Only the transactions involving payments to the Moore defendants or Storage Building are relevant to Liberty Aviation's fraud claims against those defendants; JRM Marine's payments to other non-defendants, such as payments to Rob, to Ohio Child Support, or to Rob's ex-wife are immaterial.

{¶ 58} Liberty Aviation identified transactions from JRM Marine to John, Joan Moore, KBJ, and Storage Building, but did not produce any evidence that the transactions were fraudulent under R.C. 1336.04.

{¶ 59} First, Liberty Aviation identified one payment to John in the amount of $10,600 on November 21, 2017, approximately five months before Liberty Aviation had even filed its second complaint against JRM Marine.

{¶ 60} Next, Liberty Aviation identified five payments to Joan Moore. Four of those payments, totaling $6,000, occurred in March and April 2018 before Liberty Aviation filed its complaint. The fifth payment was for $42,000 and occurred on September 21, 2018, approximately three months before JRM Marine moved for judgment on the pleadings in the underlying lawsuit. Notably, Rob owed millions of dollars to John and Joan Moore for loans that they had made to him years earlier.

{¶ 61} Liberty Aviation also identified a series of payments made to KBJ. Of those, five payments were made directly to Civista Bank between January and July 2016, nearly two years before Liberty Aviation filed its lawsuit. The remaining payments were made monthly between August 2016 and October 2018, pursuant to a lease agreement that was signed in September 2016.

{¶ 62} Finally, Liberty Aviation identified a series of payments made to Storage Building monthly between December 2016 and November 2018, with one additional payment made August 2019. The amount of the payments totaled the amount due under

26.

the loan agreement and lease agreement that were signed in September and November 2016, respectively.

{¶ 63} With the exception of the $42,000 payment to Joan Moore, all of the identified transactions occurred before—or pursuant to agreements that were entered into well before—Liberty Aviation had even filed the underlying complaint against JRM Marine. The $42,000 payment occurred early in the litigation, three months before JRM Marine moved for judgment on the pleadings and approximately two years before the $3.8 million judgment was awarded. Thus, Liberty Aviation produced no evidence that any of the payments were intended to hinder, delay, or defraud it from collecting on a judgment that would not be pursued and realized until years later. Further, Liberty Aviation produced no evidence that the transactions were made without receiving reasonably equivalent value in exchange. Thus, a claim for fraudulent transactions was futile and not warranted under existing law.

### 3. Civil Conspiracy

{¶ 64} As its last theory of relief, Liberty Aviation pursued a claim of civil conspiracy. Civil conspiracy constitutes "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415, 419, 650 N.E.2d 863 (1995); *Ohio Vestibular & Balance Ctrs., Inc. v. Wheeler*, 2013-Ohio-4417, 999 N.E.2d 241, ¶ 40 (6th Dist.). "An underlying unlawful act is

27.

required before a party can prevail on a civil conspiracy claim." *Avery v. Rossford, Ohio Transp. Improvement Dist.*, 145 Ohio App.3d 155, 165, 762 N.E.2d 388 (6th Dist.2001), citing *Williams v. Aetna Fin. Co.*, 83 Ohio St.3d 464, 475, 700 N.E.2d 859 (1998).

{¶ 65} Here, Liberty Aviation produced no evidence of a malicious combination or underlying unlawful act. Thus, its claim for civil conspiracy was futile and not warranted under existing law.

### B. Liberty Aviation's Frivolous Conduct Warranted Sanctions

{¶ 66} Notwithstanding that its claims were futile, Liberty Aviation cites a number of cases to illustrate its argument that its conduct was not sufficiently egregious to warrant sanctions.

{¶ 67} For example, in *Bikkani v. Lee*, 8th Dist. Cuyahoga No. 89312, 2008-Ohio-3130, the Eighth District reversed the trial court's denial of sanctions under R.C. 2323.51 and Civ.R. 11. In that case, Bikkani, a pro se litigant, filed a six-count complaint against his former employer and 14 other defendants alleging fraud, RICO violations, discrimination, wrongful termination, loss of consortium, and a shareholder's derivative action. *Id.* at ¶ 2. The defendants requested that Bikkani withdraw his claims, but he declined. Most of the claims were dismissed, but the action was permitted to proceed on his state-law discrimination claims. Bikkani then attempted to amend the complaint to add the defendants' attorney as a defendant, moved to disqualify the attorney, repeatedly requested that the attorney be disbarred, failed to appear for his deposition, and failed to

28.

comply with discovery requests.  In holding that the trial court must hold a hearing on the motion for sanctions for frivolous conduct, the Eighth District reasoned that Bikkani pursued claims that he knew or should have known were time-barred and frivolous, moved to disqualify counsel and have him disbarred without evidence or sound legal argument, and blatantly disregarded the rules of civil procedure.  *Id.* at ¶ 33-35.

{¶ 68} In *Bergman v. Genoa Banking Co.*, 6th Dist. OT-14-019, 2015-Ohio-2797, this court affirmed the trial court's award of sanctions against Bergman for filing a complaint including allegations of common-law fraud, fraud in the inducement, breach of contract, and estoppel in connection with a failed settlement of a foreclosure action.  This court reasoned that the facts developed during the litigation revealed that no agreement or contract ever existed between Bergman and Genoa Banking Co., despite Bergman's assertions to the contrary.  *Id.* at ¶ 31.  Thus, this court concluded that Bergman "brought claims that were not warranted under existing law, and made factual contentions that lacked evidentiary support and were not warranted by the evidence."  *Id.*

{¶ 69} Similarly, in *Stafford v. Columbus Bonding Ctr.*, 177 Ohio App.3d 799, 2008-Ohio-3948, 896 N.E.2d 191 (10th Dist.), the Tenth District affirmed the trial court's award of sanctions where Stafford filed a complaint outside of the statute of limitations, and where "it was clear to [Stafford] at the time of the filing of CBC's answer that CBC had not waived the statute-of-limitations defense."  *Id.* at ¶ 13.  The court determined that Stafford's "further pursuance of those claims after the point of CBC's filing of its answer

29.

was * * * a violation of Civ.R. 11 and R.C. 2323.51." *Id.* The court also found that Stafford's attempt to re-characterize an assault and battery claim as one for intentional infliction of emotional distress to avoid statute of limitations issues was likewise frivolous. *Id.* at ¶ 18.

{¶ 70} Lastly, in *Keith-Harper v. Lake Hosp. Sys., Inc.*, 2017-Ohio-7361, 96 N.E.3d 823 (11th Dist.), the Eleventh District affirmed the trial court's award of sanctions where Keith-Harper continued to pursue her claims after it became clear that no factual basis existed to support them. In that case, Keith-Harper alleged multiple causes of action against her former employer including age discrimination, wrongful termination, disability discrimination, unlawful FMLA retaliation, workers' compensation retaliation, and intentional infliction of emotional distress. *Id.* at ¶ 3. Following discovery, it became clear that there was no evidence Keith-Harper had ever requested or taken FMLA, was disabled or perceived as disabled, was terminated for claiming workers' compensation benefits that ended ten months earlier, was targeted because of her age, or that the defendants exceeded their legal right to criticize and correct plaintiff's work. *Id.* at ¶ 20. Thus, the court held that Keith-Harper's claims were frivolous and affirmed the trial court's award of attorney fees incurred for services provided following discovery. *Id.* at ¶ 30.

{¶ 71} Contrary to those cases, Liberty Aviation suggests that its conduct was more akin to *Texas Life Ins. Co. v. Peck*, 8th Dist. Cuyahoga No. 108352, 2020-Ohio-

30.

570. In *Peck*, the Eighth District affirmed the trial court's denial of R.C. 2323.51 and Civ.R. 11 sanctions where the plaintiffs brought a claim challenging the decedent's change of beneficiary that was made ten days before his death. In denying the motion for sanctions, the trial court reasoned that a change in beneficiary shortly before one's death "is a questionable circumstance that justifies inquiry." *Id.* at ¶ 24. On appeal, the Eighth District affirmed, reasoning that a claim of undue influence is difficult to prove, and the plaintiffs attempted to pursue their claim by obtaining the decedent's medical records. However, financial restraints made it difficult for the plaintiffs to hire an expert and pay their lawyer. Further, the case was made more difficult by conflicts amongst the plaintiffs. *Id.* at ¶ 27. Thus, the court concluded that the plaintiffs' case was not frivolous. *Id.*

{¶ 72} In comparing these cases to the present situation, it is important to note that the trial court did not find that Liberty Aviation's conduct in filing the amended complaint was frivolous. Instead, the trial court found that Liberty Aviation's conduct was frivolous when it continued to pursue the claims following discovery and the depositions of John, Patrick, and Frantz. Thus, although Liberty Aviation's conduct was not outrageous like the conduct in *Bikkani*, it is quite analogous to the conduct in *Bergman*, *Stafford*, and *Keith-Harper*. As discussed above, Liberty Aviation continued to pursue its claims by seeking to amend the complaint to add additional defendants and by vigorously defending against the Moore defendants' and Storage Building's motions

31.

for summary judgment after the point at which it reasonably should have known that its claims were not warranted under existing law. Therefore, the trial court did not err in finding that Liberty Aviation's conduct was frivolous.

### C. No Affirmative Duty to Mitigate

{¶ 73} Finally, Liberty Aviation argues that the Moore defendants and Storage Building had a duty to mitigate the amount of attorney fees by informing Liberty Aviation that its claims were frivolous or by moving to dismiss the complaint. In support, Liberty Aviation cites *Pisanick-Miller v. Roulette Pontiac-Cadillac GMC, Inc.*, 62 Ohio App.3d 757, 764, 577 N.E.2d 446 (11th Dist.1991), for the proposition that "[a] movant cannot recover fees which were incurred as a result of his own improper conduct."

{¶ 74} In that case, the defendant moved for sanctions following the plaintiff's voluntary dismissal of her complaint. *Id.* at 759. Following a hearing, the trial court denied the defendant's motion on the grounds that although the defendant raised the affirmative defenses of res judicata and statute of limitations in its answer, it never moved to dismiss the case. *Id.* at 760. As a result, the trial court concluded that the defendant "had failed to take the necessary steps to terminate the action as soon as possible." *Id.* On appeal, the defendant argued that the trial court erred in denying the recovery of *any* attorney fees and contended that it was entitled to recover the fees it would have incurred if it had moved to dismiss the complaint at the proper time. *Id.* at

32.

764. The Eleventh District agreed and reversed the trial court's decision, reasoning in dicta that while its research did not uncover "any cases in which an Ohio court has applied the mitigation rule to an award of attorney fees under R.C. 2323.51 or Civ.R. 11," R.C. 2323.51 implies that "the movant cannot recover fees which were incurred as a result of his own improper conduct." *Id.*[5] The court, though, explained that application of the mitigation rule does not act as a complete bar to recovery, but instead "merely prohibits the recovery of the increased loss." *Id.* Thus, the Eleventh District held that the trial court erred when it denied the recovery of *any* attorney fees incurred by defendant. *Id.*

{¶ 75} Notably, *Pisanick-Miller* relied upon a prior version of R.C. 2323.51(B)(3)(a), which stated that the movant is only entitled to reasonable fees "that would have been charged for legal services necessitated by the frivolous conduct * * *." The current version of R.C. 2323.51 does not include that language, but instead states, "any party adversely affected by frivolous conduct may file a motion for an award of court costs, reasonable attorney's fees, and other reasonable expenses incurred in connection with the civil action or appeal." R.C. 2323.51(B)(1). For non-contingency fee situations, an award of reasonable attorney's fees under R.C. 2323.51(B)(1) "shall not exceed, and may be equal to or less than * * * the attorney's fees that were reasonably

---

[5] This portion of the Eleventh District's decision is dicta because the court actually reversed the decision and remanded the case to the trial court for a new hearing on sanctions for the reason that trial court erroneously considered evidentiary materials submitted by both parties after the original hearing.

33.

incurred by a party." R.C. 2323.51(B)(3)(b). Thus, while R.C. 2323.51 does not impose an affirmative duty to mitigate damages, a party adversely affected by frivolous conduct may only recover attorney fees that were "reasonably incurred." *See Hicks v. Cadle Co.*, 2019-Ohio-5049, 150 N.E.3d 381, ¶ 132 (11th Dist.) (no legal duty under R.C. 2323.51 to mitigate damages by negotiating settlement of frivolous claims).

{¶ 76} Here, the trial court determined that Liberty Aviation's conduct following November 30, 2021, was frivolous. After that date, the Moore defendants and Storage Building incurred attorney fees preparing and appearing for Liberty Aviation's deposition of Lara Frantz, responding to Liberty Aviation's motion for leave to file a second amended complaint to add Storage Building II and Donald Williams as defendants, moving for summary judgment, and seeking sanctions. Each of those fees were reasonably incurred as a result of Liberty Aviation's frivolous conduct in continuing to pursue its claims after it became clear that those claims were not warranted under existing law. The trial court, therefore, did not err in awarding attorney's fees to the Moore defendants and Storage Building under R.C. 2323.51.

{¶ 77} Accordingly, Liberty Aviation's assignment of error is not well-taken.

## IV. Conclusion

**{¶ 78}** For the foregoing reasons, the judgment of the Ottawa County Court of Common Pleas is affirmed. Liberty Aviation is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.           _____
                                          JUDGE

Christine E. Mayle, J.

_____

Charles E. Sulek, J.                              JUDGE
CONCUR.

_____

                                          JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.